**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

IN RE LETTER OF REQUEST    )
FROM ITALY    )
IN THE MATTER OF    )    Misc. No. 06-
CRISTALLI    )

**GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF APPLICATION FOR ORDER**

This memorandum of law is submitted in support of the Application for an Order pursuant to Title 28, United States Code, Section 1782, in order to execute a letter of request from Italy. A copy of the translation is attached.

FACTUAL BACKGROUND:

This investigation is being conducted by the Italian authorities who are investigating a case of alleged fraud.

EVIDENCE SOUGHT:

The Italian authorities seek information from the Delaware Secretary of State's Office and an individual which may reside in this District. The authority for this Court to accede to this request is contained in Title 28, United States Code, Section 1782, which states in part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person

appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

The proper criteria for determining whether the court should exercise its discretion in favor of executing the request are outlined in *In Re Request for Judicial Assistance from the Seoul District Criminal Court*, 555 F.2d 720, 723 (9th Cir. 1977) (citation omitted):

> Under the statute the only restrictions explicitly stated are that the request be made by a foreign or international tribunal, and that the testimony or material requested be for use in a proceeding in such a tribunal.... [and] that the investigation in connection with which the request is made must relate to a judicial or quasi-judicial controversy.

Moreover, " (t)he judicial proceeding for which assistance is sought ... need not be pending at the time of the request for assistance; it suffices that the proceeding in the foreign tribunal and its contours be in reasonable contemplation when the request is made." In Re Letter of Request from the Crown Prosecution Services of the United Kingdom, 870 F.2d 686, 687 (D.C. Cir. 1989).

The letter of request in this case shows that the information sought is for use in such proceedings in Italy and hence the request comes well within those circumstances

contemplated by Congress in expanding the Federal Courts' authority to act in such matters. _In Re Letter of Request from the Crown Prosecution Service of the United Kingdom_, 870 F.2d 686, 689-91 (D.C. Cir. 1989); _In Re Letters Rogatory from the Tokyo District, Tokyo, Japan_, 539 F.2d 1216, 1219 (9th Cir. 1976).  Therefore, I ask this Court to honor the request for assistance.

The reception of letters of request and the appointment of a Commissioner to execute them are matters customarily handled ex parte, and persons with objections to the request raise those objections by moving to quash any subpoenas issued by the Commissioner. _Id._

**WHEREFORE**, the United States requests that the Court issue an Order, in the form, appended hereto, appointing a Commissioner in order to execute the request for assistance.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:

Richard G. Andrews
Assistant U.S. Attorney
Delaware Bar I.D. No.2199
1007 Orange Street
Wilmington, DE    19801
(302) 573-6277

Dated: 10|2|06



# Procura della Repubblica
## presso il Tribunale di Trento
***
### Public Prosecutor's Office
#### Court of Trento

No. 5985/03 mod. 21
ROG. 14/06

To the
*Italian Ministry of Justice* – Ministero della Giustizia
Direzione Generale della giustizia penale
Ufficio II rogatorie, estradizioni e cooperazione internazionale
Rome

For the submission to the Attorney General of the United States of America (Art. 2, par. 2 of the Italy - US Mutual Assistance Treaty, signed in Rome on 9th November 1982).

The Public Prosecutor Dr. Paolo Storari at the Court of Trento,

Address: Trento, Largo Pigarelli no. 1
phone:
fax:
mobile:
e-mail:

requests judicial assistance according to the Italy - US Mutual Assistance Treaty, signed in Rome on 11/9/82;
concerning the penal proceeding against:

**CRISTALLI GIOVANNI**, born in
   1. Company director of the impresa individuale (single proprietorship) B.G.C. Corporation Italia based in Carpaneto Piacentino, Via Bricchi 12 and constituting a steady organization of BGC Corporation based in Deleware (USA)
   2. Company director of Motors Cristalli s.r.l. based in Carpaneto Piacentino (Pc), Via Roma 12
   Defended by the counsels Veneziani and Loranzi, court of Piacenza

**investigated**

for the offence provided for in
   a) art. 81 penal code, 2 decree law 74/2000 because
   in execution of a criminal activity pattern,
   in his function as a director,

in order to obtain an undue VAT-deduction,

making use of subjectively not existent invoices made out by the companies Zorzi Francesco, New Car di Marangoni Giancarlo, impresa individuale (single proprietorship) Marangoni Giancarlo, MG Car di Cortese Roberto, Alto Nord di Ceresa Carlo and Sices Srl.,

1. he indicated fictitious debits amounting to € **326.547,13** in the VAT declaration of Motors Cristalli s.r.l. relating to the accounting period 1999 filed on 31st July 2000;

2. he indicated fictitious debits amounting to € **1.308.727,58** in the VAT declaration of B.G.C. Corporation Italia relating to the accounting period 2001 filed on 24th October 2002;

3. he indicated fictitious debits amounting to € **2.368.434,90** in the VAT declaration of B.G.C. Corporation Italia relating to the accounting period 2002 filed on 20th October 2003;

4. he indicated fictitious debits amounting to € **2.631.669,71** in the VAT declaration of B.G.C. Corporation Italia relating to the accounting period 2003 filed on 15th October 2004;

5. he indicated fictitious debits amounting to € **13.158.340,33** in the tax return of B.G.C. Corporation Italia relating to the accounting period 2003 filed on 15th October 2004;

6. he indicated fictitious debits amounting to € **2.273.716,62** in the VAT declaration of B.G.C. Corporation Italia relating to the accounting period 2004 filed on 8th October 2005;

7. he indicated fictitious debits amounting to € **11.368.583,38** in the tax return of B.G.C. Corporation Italia relating to the accounting period 2004 filed on 8th October 2005;

offence committed in Piacenza on the dates of tax return and VAT declarations.

**b)** Art. 110 penal code, 216 par. 1 no. 1, 219 par. 1 and 2 no. 1 R.D. (Royal Decree) 267/1942, because as a company director, in concert with Francesco Zorzi (as director of the impresa individuale [sole proprietorship] Zorzi Francesco) and with currently not identified persons, he misappropriated company funds of the sole proprietorship Zorzi Francesco (declared bankrupt by the Court of Trento on 17th February 2005) for an amount of at least € **1.832.927,38** through the following transactions:

a) foreign companies sold a series of motor-cars (without VAT according to the Decree Law D.L. 331/93) to Zorzi company for a total amount of € **15.379.979,81;**

b) then Zorzi company sold these cars to B.G.C. Corporation and Motors Cristalli Srl for a total amount (inclusive of VAT) of € 17.212.907,19, thus apparently "below cost" since VAT should only be a clearing entry and therefore paid to the exchequer;

c) in reality the relation between the foreign companies on the one hand and B.G.C. Corporation and Motors Cristalli S.r.l. on the other is a direct one, while Zorzi company is no more than an interposed firm whose purpose is to omit paying VAT and consequently to bringing competitive automobiles on the market, since part of the VAT goes to the supplier, the other is retained and then divided up between Cristalli and Zorzi.

All this generated a huge tax liability conducing Zorzi company to bankruptcy declared by the Court of Trento on 17th February 2005.

Buying the cars from Zorzi, Cristalli, who was perfectly aware of the fraud mechanism and shared out the VAT amount with Zorzi, gave an accidentally relevant contribution to the above mentioned misappropriation crime.

With the aggravating circumstances to have committed several misappropriation crimes and have caused a damage of relevant gravity against property.

**c)** Art. 110 penal code, 216 par. 1 no. 1, 219 par. 1 and 2 no. 1, 223 par. 1 R.D. 267/1942, because as a company director, in concert with Francesco Zorzi (as director of the sole proprietorship Zorzi Francesco) and with currently not identified persons, he misappropriated company funds of the sole proprietorship Zorzi Francesco (declared bankrupt by the Court of Trento on 17th February 2005) for an amount of at least € 747.430,74 through the following transactions:
a) foreign companies sold Sices s.r.l. a series of motor-cars (without VAT according to the Decree Law D.L. 331/93) for a total amount of € 2.871.469;
b) then Sices company sold B.G.C. Corporation these cars for a total amount (inclusive of VAT of € 3.618.899,99, thus apparently "below cost" since VAT should only be a clearing entry and thus paid to the exchequer;
c) in reality the relation between the foreign companies and B.G.C. Corporation is a direct one, while Sices s.r.l. is no more than an interposed firm whose purpose is not to pay VAT and consequently to bring competitive automobiles on the market, since part of the VAT goes to the supplier, the other is retained and then divided up between Cristalli and Zorzi.
All this generated a huge tax liability conducing Sices s.r.l. to bankruptcy declared by the Court of Trento on 17th February 2005.
Buying the cars from Sices s.r.l., Cristalli – who was perfectly aware of the fraud mechanism and shared out the VAT amount with Zorzi – gave an accidentally relevant contribution to the above mentioned misappropriation crime.
With the aggravating circumstances to have committed several misappropriation crimes and to have caused a damage of relevant gravity against property.

**d)** art. 110 penal code 223 par. 2 no. 2, R.D. 267/1942, in the above mentioned function, in concert with Zorzi Francesco and currently not identified persons, he caused the bankruptcy of Sices s.r.l. due to the above mentioned transactions.
Committed in Trento on 17th February 2005, day of bankruptcy declaration of Sices s.r.l. and of the sole proprietorship Zorzi.

Besides the offences provided for in art. 292 DPR no. 43/1973, 70 DPR 633/1972

## 1. Preliminary
Despite its numerous variants, the community VAT fraud mechanism can be summed up as follows: a foreign company (A) sells products to a fictitious Italian company (B). Since it is an intra-community transaction no VAT is paid. The fictitious company sells the products to an Italian company (C) with a structure, employees etc. When the fictitious Italian company sells the products to the customer, it dos not pay VAT to the exchequer, on the contrary, it retains the VAT amount often sharing it with the company (C), so the operation is profitable for all the parties involved.
This mechanism allows it to bring extremely competitive cars on the market. In fact: the foreign company (A) sells products to the fictitious company (B) for an amount of 100 € (example) without VAT because it's an intra-community transaction. The fictitious company sells the goods to C for an amount of 90 € + VAT (i.e. 108 €), in practice "below cost" since VAT should be paid to the exchequer. For the fictitious Italian company the sale

isn't below cost because it doesn't pay VAT to the revenue authorities, but it "retains" VAT to the extent that it pays 100 € to the supply firm and the rest is shared (in variable percentages) among (B) and (C). This to the satisfaction of all the parties involved in the transaction. In fact:

The Italian dealer (C in the above mentioned example) brings highly competitive products on the market, because he purchases the goods at 90 € and VAT is tax-deductible and he has funds not recorded in the books at his disposal. The client who buys the car on the market will find a very low price.

The fictitious company B makes – at least partially – profit by not paying VAT to the exchequer. The victims of the fraud are of course the exchequer and the honest dealers who are vulnerable to this sort of unfair trade practice.

You can see from this example that the fraudulent mechanism implies numerous difficulties: international letters rogatory, destruction of documents; in many cases the directors of the fictitious companies are persons without a real managing power and receive a sort of "pay" from the persons who are the real domini of the activity; difficulty in reconstructing the mechanism as a whole; all these are elements that makes the investigation arduous.

What is often not taken into account by the investigated persons is the perspective of bankruptcy. It's clear that the VAT retained by the perpetrators of the fraud (at least for the part not intended for the payment of the supplier but shared) is not paid to the exchequer but misappropriated.

For this reason on 17th February 2005 Sices s.r.l. and the single proprietorship Zorzi Francesco - fictitious companies managed by F. Zorzi – were declared bankrupt.

On the basis of the above mentioned declaration of bankruptcy Zorzi was remanded in custody for having committed the offence of bankruptcy and for having caused the fraudulent failure of the company.

Zorzi was interrogated on 25th, 27th June and 30th July 2005. During these interviews regarding Cristalli, he unveiled the fraudulent mechanism they applied for different years and that caused an extremely extensive damage to the exchequer, and not only the Italian one as you will see later.

### 2. Grave evidence against Cristalli: statements made by Zorzi Francesco

*Question: "Please, tell us how your car import activity commenced?"*

*Answer: "I have to divide my activity into two different periods: till 1999 I only imported cars from abroad and on-sold them in Italy with a certain profit margin and without paying VAT to the authorities. My profit amounted all in all to 4 – 5 %; example: I buy a car abroad for an amount of 100 and I on-sell it in Italy for 105 (inclusive of VAT). After 1999 this type of activity changed: I bought cars in the European Union (Germany, Austria above all) and then I on-sold them in Italy, but my profit margin was lower because the difference between the purchase price and the resale price was divided between me and the Italian trader to whom I returned part of the cash; example: I buy a car for an amount of 100 and on-sell it for 115 to the Italian trader, 13 out of 15 of the profit margin goes to the Italian trader, the rest (2) is for me; recently the percentage of my profit margin was derisory, i.e. 1.75 – 1.85% calculated on the amount of the foreign invoice.*

*Question:* "A list of Italian clients of the company SICES and of the sole proprietorship ZORZI - for which the VAT was given back - is shown to the investigated person. It is declared that the above mentioned list is attached to the record constituting part and parcel of it."

*Answer:*
omission
I now want to report facts about B.G.C. CORPORATION di Cristalli Giovanni. Three principal types of fraudulent car - transactions have been adopted with this client:

there was the usual cash return and my percentage was 2% of the sales invoice inclusive of VAT, i.e. 2.5% of the foreign purchase invoice. I used to give him back the cash in Piacenza; this cash repayment mechanism was applied above all in 2004, previously I sold the cars without paying VAT. You ask me which was the percentage of cars supplied invoiced to me by the companies indicated by Cristalli. I answer that Cristalli found 80% of the cars purchased and I found the residual 20 %.

There also has been over-invoicing in some cases to the extent that I happened to sell cars to Cristalli for a certain amount inclusive of VAT and then give him back a part by cash. This procedure was different from the procedure previously described, because in this case the foreign supplier was my supplier and not the supplier of Cristalli. This way of fraudulent trading went on right through my business relations with Cristalli.
Cristalli had business relations with the United States and Canada. These non-EU suppliers invoiced to me and I invoiced to BGC CORP. paying only the excise and omitting to pay VAT (in fact the cars were placed into VAT-warehouse). In these cases Cristalli's return was extremely high because the difference between the purchase price and the sales price was very high, thus also the cash repayments were particularly high.
As regards the business relations with the foreign suppliers, I never met the US and Canadian suppliers. It was Cristalli who had relations with these suppliers. Cristalli had also relations with a Spanish supplier of Girona (TECNICAMER SRL) and with suppliers from Germany and Austria. Cristalli often collected the cars purchased in the EU-countries with his own car transporter. I remember that Cristalli used to apply to a carrier from Piacenza, I don't remember his name. This carrier had a tractor to be hooked to the transporter. I don't know if the carrier knew that he made the transports on behalf of Cristalli; in any case the carrier invoiced to me."
Omission
*Question:* "Can you list the companies you have materially managed in the course of the years?
*Answer:* "Sole proprietorship ZORZI, SICES, MG Car di CORTESE ROBERTO and NEW CAR (in part managed by the undersigned).
*Question:* "We show you now a non exhaustive list of foreign suppliers. Which suppliers have been used by the Italian traders, i.e.: which are the suppliers towards which Zorzi's companies have been interposed as fictitious firms?
*Answer:* "STROEBL, HAAS, KNOLL, ASM, BACHER, STAR TERRE (recommended by Cristalli), **Fritz Schillinger (also recommended by Cristalli)**, PREMIUM LEASING (used both for the cars I sold and as a supplier towards which I interposed myself on behalf of

BGC). All these companies (together with the Spanish and non UE-firms that I've already mentioned) have been indicated to me by Italian clients and I simply interposed myself.
omission

**Question:** "We now show you some sheets constituting the attachment no. 05 of the Criminal Police notation dated 23 June 2005. Please, explain these sheets."

**Answer:** "These sheets have been found in my flat in Salzburg; i.e. schedules filled in by Cristalli Giovanni. I'm going to explain them as follows; the column titled CLIENT indicates the client of Cristalli and I don't know who it is; then there are the columns with the frame and the model of the car; the column INVOICE shows the amount of my invoice to BGC; the column ARRANGEMENT shows what has been arranged between my person and Cristalli, i.e. how much I actually received after having deducted the cash repayment; the column PAID refers to the amount of the invoice I made out and that has been paid; the initials F and G that appear in the last columns are the initial letters of Francesco and Gianni and as you can see the column G refers to the difference between what is paid and what has been agreed and what represents the cash return. In some cases also the column F is filled; this column refers to the money I had advanced on behalf of Cristalli. I would like to point out that in some cases there are compilation errors in the columns, i.e. some numbers are inverted, but it doesn't interfere with the interpretation criteria that I suggested to you. I received these tables from Cristalli by hand o by fax.
Omission

**Question:** "We now show you a table extrapolated from the computer used by GRUIA DEJZI. Please, explain these tables. It is declared that a copy of the table is attached to the record."

**Answer:** "The table you are showing to me is divided into different columns where the column "cost" refers to the cost I actually met inclusive of the purchase invoice of the car plus other expenses for the layout; the column "sale" refers to the amount I actually collected and that in some cases is lower than the invoice with VAT because, as I already said, some clients received cash repayments.

**Question:** "Do you know Tiziano MONTESSA?"

**Answer:** "He was a partner of Cristalli; I remember he was speaking English and it is possible that he was the person who kept the relations with the foreign companies. But this isn't a proof that he knew something about the fraud.

**(statement 25th June 2005)**

**Question:** "According to the documentation seized your firms acted at least since July 1999 as fictitious companies for Cristalli Motors. How can you reconcile this documentary evidence with what you said some days ago when you asserted that your activity as an interposed company began in the year 2000?

**Answer:** "It's possible that I got wrong and anyway these documents you refer to regard the supplier SCHILLINGER. I became acquainted to this supplier through Cristalli, as I already said. As I said to you previously, once I'll get the invoices I can be more precise about the timing of my activity.

**Question:** "What kind of relation is there between Cristalli and Pascal Della Valle?"

**Answer:** "Della Valle lives in Germany and is an intermediary. He finds German car traders. Della Valle was my supplier. You ask me if my business relations as a fictitious firm passed also through Della Valle. I answer no, it never happened, perhaps only one time.

*Question*: "*Considering that the documentation seized contains sales invoices relating to car sales to Italian car traders with a date antecedent to the purchase invoices for car purchases abroad. Can you explain this apparent absurdity?*

*Answer*: "*It is possible that I backdated an invoice at the instance of some client because maybe he was in need to advance a VAT input tax.*

*Question*: "*We now show you the attachment 5/7 of tha Criminal Police notation lodged on 23rd June 2005 (that is attached to the record). Please, explain this.*

*Answer*: "*The table contains the amount of the purchase invoice from abroad, the costs I met (at the point CONCES E) and the taxable amount of the invoice I should have made out to the client. In the table there is no column regarding the VAT on the taxable amount; the difference between the invoice with the taxable amount and the amount indicated in the point CONCES E represents my profit except for eventual repayments. You ask me why the difference between the purchase invoice and the sales invoice is higher in the case of vehicles coming from non-EU countries with respect to vehicles coming from EU-countries (with a consequent cash repayment increase). I answer that the cost in the USA and Canada is lower than the cost in the European countries.*

*Question*: "*In the documentation seized we found self-invoices with the logo of your firms but sent to the customs from the fax of Cristalli. Can you explain the reason of this anomaly?*

*Answer*: "**As I already said in the previous interview, the traffic in motor-cars from the USA and from Canada was managed directly by Cristalli, it wasn't my field. It could happen that Cristalli sent the self-invoice to me and I only copied it down and forwarded it to the shipping agent PARODI. Sometimes it happened that I was in Cristalli's office and used his fax. Sometimes Cristalli was unable to localize me, so he sent the self-invoice in my name because solicited by the shipping agent.**

*omission*

*Question*: "*Does Cristalli have accounts abroad as far as you know?*"

*Answer*: "*To my knowledge he has an account in Switzerland as BGC CORPORATION based in Delaware (United States).*

*omission*

**(statement 27th June 2005)**

*Question*: "*Did you look at the invoices received?*"

*Answer*: "*Yes I did and I made out schedules with red signs in those cases (cars and suppliers) in which I acted as a fictitious firm, i.e. if the car is written down in red, it means that I shared VAT with my Italian client. In some cases I only received the sales invoices, thus I wasn't able to trace the foreign supplier without the purchase invoices. So, the work I've done is incomplete, i.e. there are other cases where I acted as an interposed firm. I herewith produce the schedules as an excel file with 2 floppy disks (exhibits A and B)*"

*omission*

"*You ask me who were the other Italian clients with which I used the over-invoicing mechanism. I answer that I used this mechanism also with (omission) BGC, Cristalli Motors, (omissis). In brief I can say that if you find a significant difference between the purchase invoices and the sales invoices – and this with a certain continuity – that means that there has been a repayment.*

*omission*

*You show me documents you've found in my home in Salzburg/Austria:*

*Canmar Contship is the name of a company that hires containers. The bank code was given to me by the company Cristalli because for the supplies from non-EU countries Cristalli made use of containers (exhibit 1).*

*CMR (in the name of Rapaccioli) refers to the carrier that used to make transports for Cristalli (exhibit 2). The Excel documents entitled "sheet 1" are car requests compiled by Cristalli.*

*In fact, there appears the name of Cristalli's client that I certainly could not know (exhibits 3 and 3 bis).*

*The handwritten sheet entitled "list of sold cars" was given to me by Cristalli and it seems that the handwriting is that of Tiziano Montessissa (exhibit 4).*

*omission*

*The sheet "copies for Yoghi" (it's me) has been compiled by Cristalli (it's his handwriting)(exhibit 6); same for the other two schedules that you are showing me (exhibits 7 and 8).*

*omissis*

*You show me a schedule from Gruja's computer and I confirm that it was me who prepared the schedule you've found on that PC in Baden Baden.*

**(statement 30th July 2005)**

## 2.1 Heavy evidence against Cristalli: the individualizing confirmations of Zorzi's statements

Zorzi's statements in the matter of Cristalli's position have been confirmed by sufficient documental and testimonial evidence, and this under a dual point of view: first in relation to the interposition of Zorzi; that means that there was a direct business relation between Cristalli and the foreign companies; second in relation to the VAT sharing: in fact it has been confirmed that it was Cristalli who took the greatest advantage of the fraudulent mechanism.

Zorzi Francesco said that Cristalli had direct relations with the Spanish supplier Tecnicamer and with the German and Austrian suppliers, specifying that it was Cristalli who introduced the firm Autohaus Fritz Schillinger to Zorzi and that his firms have been interposed as fictitious firms within the business relations with Autohaus Schillinger.

This assertion is greatly confirmed.

1. According to the interception of the fax line no. 0523/850753 (registered in the name of BGC Corporation Italia) on 19th May 2005, 3.40 p.m the German supplier Autohaus Fritz Schillinger sent the following documents to Cristalli:

- invoice no. 15277 49962 dated 18th October 1999 relating to the sale of a Chevrolet Corvette Cabrio mod. 99 to M.G. CAR di CORTESE ROBERTO (fictitious firm of Zorzi), invoice value D.M. 88041,00 equivalent to Lit. 87.160.501; previous order by Cristalli Motors dated 21st September 1999, citing at the bottom both the offer and the acceptance confirmation of Cristalli Motors and with the wording "% taxes % discount"; a reminder fax dated 24th Sept. 1999, in which Tiziano reserves to communicate the name of the subject for the invoice heading; confirmation of Autohaus Fritz Schillinger with the indication of the price 88.041 DM and the wording "% taxes % discount". It has been established that the vehicle in question was then re-invoiced by Zorzi Francesco to Motors Cristalli with the no. 34 and dated 30th Oct. 1999 of M.G. CAR di CORTESE ROBERTO.

2. According to the same interception on 20th May 2005, 6.35 p.m the German supplier Autohaus Fritz Schillinger sent the following documents to Cristalli:

- invoice no. 7360 43368 dated 20th July 1999 made out to the firm Zorzi Francesco relating to the sale of a Chevrolet Corvette, value DM 90.385,78 equivalent to Lit. 89.481.831; acceptance and confirming letter relating to the Chevrolet by Cristalli Motors; the sender of the above mentioned letter reserves to communicate the name of the subject for the invoice heading; a form for the procuratory for registering the car in the name of Loris Capirossi and for collecting the pertaining vehicle registration document; acknowledgement of the vehicle with the indication of the name of Zorzi Francesco; 2 forms for the acknowledgement of the vehicle for the German revenue office with indications below to complete the form with the stamp and the personal details of Zorzi Francesco (02031680172) or (as you can see in the second form) with the details of Motors Cristalli, in this case at Zorzi's instruction. It has been established that this vehicle has been on-sold by Zorzi to Motors Cristalli too, this time with the homonymous sole proprietorship, with invoice no. 64 dated 21st July 1999 with an under-invoicing of 10%.

3. In the matter of the Spanish firm Tecnicamer SL based in Girona (other company that Cristalli indicated to Zorzi: "*Cristalli had also relations with a Spanish supplier based in Girona [Tecnicamer Srl]*)" a letter rogatory has been sent to the competent authorities and in particular Mr Eric Fores Reverte (legal representative of Tecnicamer) has been interrogated. He said he had business relations with Cristalli and Tiziano Montesissa in 2000 and with Zorzi in 2002 and 2003.

According to the bank analysis in the second trimester of the year 2000 Tecnicamer sold motor-cars directly to Cristalli Motors for an amount of € 209.014.538. In 2002 and 2003 Tecnicamer sold 40 vehicles to the sole proprietorship Zorzi. 35 of these cars were then on-sold by Zorzi to BGC Corporation through the usual under-invoicing mechanism, i.e. selling them at a price insufficient to cover the cost. Apart from the partial divergence between Reverte's version and what appears in the data bank, it is important to notice that there is no entrepreneurial/managerial reason aiming at major revenues that can justify the interposition of an intermediary in a transaction (which shortly before was conducted directly with the supplier and without intermediaries) because this intermediary has to be paid for his intervention unless he operates (as in Zorzi's case) in an apparently uneconomic way (condemning himself to bankruptcy).

4. The examination of the data sheets of the subscriber no. 0523859660 (registered in the name of BGC) for the period 3 February 2003 – 4th February 2005 shows that this subscriber has contacted 13 times the number registered in the name of Dejzi Gruja, a friend of Zorzi and employee at CC Car Company of Ziegler Kurt, German supply firm of Zorzi for an amount of € 8.134.449 (for the sole proprietorship) and 2.437.250 (for Sices s.r.l.).

From 2nd April 2004 to 4th October 2004 the above mentioned subscriber has contacted 258 times the international no. 00491711447693 registered in the name of Della Valle Pascal, who (known by Zorzi) is a "*mediator to the extent that he finds the German traders who sale cars*".

The above mentioned information show unequivocally that Cristalli had direct relations with a direct supplier of Zorzi and with an intermediary who lives in Germany and whose job is to find German traders who sale cars.

5. As we have seen, Zorzi declared: *"Cristalli often collected the cars purchased in the EU-countries with his own car transporter. I remember that Cristalli used to apply to a carrier from Piacenza, I don't remember his name. This carrier had a tractor to be hooked to the transporter. I don't know if the carrier knew that he made the transports on behalf of Cristalli; in any case the carrier invoiced to me."*

This circumstance has been confirmed too. On 5th September 2005 Rapaccioli Luigi (head of the homonymous single trucking firm) declared: *"The cars were transported with a tractor of my firm and an appropriate tow, normally referred to as car transporter, put at my disposal by Cristalli Giovanni. I specify that the owner of this means of transport is a firm based in Piacenza: I suppose it is the firm Mutti Autotrasporti. Plate no. AC72770. I aim to send you the vehicle registration document via fax as soon as I return to my firm".* Pointing out that *"Zorzi Francesco used to request the transport leaving a message in my letter-box"* he underlined that *"Cristalli informed me in advance, sometimes by phone and sometimes verbally, that Zorzi would call me for a transport."*

The disposal of Cristalli's car transporter to shipping the cars (formally purchased by Zorzi) from the EU countries to Italy and the fact that he informed the carrier in advance that Zorzi would call for a transport are an evidence that Zorzi was not autonomous, at least as regards some suppliers.

6. **Zorzi declared that Cristalli also interposed his (Zorzi's) fictitious firms within the relations with third countries (USA and Canada). Unlike the case with the communitarian sales mechanism, in this case VAT evasion becomes even more simpler: when goods enter Italy from a non communitarian country it's normally necessary to pay excise or VAT before the marketing of these goods; VAT is not immediately paid if the goods are placed into a VAT-warehouse awaiting a destination (because the receiver is unknown at the moment). In this case the importer can extract the goods from tax warehouse by means of self invoicing and VAT should be paid when it comes to sale the goods within the national territory.**

**After having imported the goods and made out e self-invoice, Zorzi extracted the goods from the tax warehouse, sold the car to Cristalli and didn't pay any VAT. The operation is very simple and extremely profitable.**

**In this case (like in the case with the communitarian sales) it has been ascertained that the interposition of Zorzi's fictitious firms is lacking in any economic reason; its only function is to evade VAT. In this regard it has been ascertained that the Canadian firm Imex acted as a direct supplier for Cristalli Motors (for an amount of £ 948.230.549) from October 1999 and then as a supplier for the fictitious firms headed by Zorzi (who then on-sold the cars to Cristalli) and in particular: from November 1999 till January 2000 MG di Cortese Roberto purchased 10 cars from Imex for a total amount of £ 129.802.799; from October 2000 till June 2001 MG di Cortese Roberto purchased cars from Imex for a total amount of £ 334.218.063; from 2nd October 2001 till 11th Oct. 2001 the sole proprietorship Marangoni purchased cars from**

Imex for an amount of £ 297.557.392; the same for the sole proprietorship Zorzi (purchases from Imex for an amount of £ 1.282.815,77 in 2002 – 2003).

As Imex, also Technesse Ltd. was at first a supplier of Motors Cristalli (for an amount of £ 842.503.522 from June 1998 to September 1999) and then of MG di Cortese Roberto.

In this case there isn't any entrepreneurial reason for interposing an intermediary (a transaction took place shortly before directly with the supplier and without intermediaries) because the intermediary has to be paid for his intervention, unless he operates (like Zorzi's fictitious firms) in an uneconomic way (condemning himself do bankruptcy).

Tanks to technical investigational activities we gained full evidence of the direct relationship between the American supplying firms that supplied cars to Zorzi (in particular De Piero, who was a supplier of the firm Sices srl in 2005) and to Cristalli: on 9th May 2005 9.38 a.m. a conversation has been intercepted between Franco De Piero (owner of Piero Classic Motors based in San Francisco and of the homonymous Canadian firm based in Montreal, and also car supplier for Zorzi and Sices s.r.l. that later sold the cars to BGC) and BGC:

*Simona: Cristalli, good evening.*
*Franco: Ciao Simona, how are you?*
*Simona: Good eveningFranco, how are you?*
*Franco: I wanted to talk to him if he has some news for me;*
*Simona: I don't know because Giovanni is not here in the office, I don't know anything about this.*
*Franco: I understand.*
*Simona: They don't say anything to me; they keep me in the dark about these things.*
*Franco: I understand, I understand!*
*Simona: He has to talk to them. Listen...*

During the phone call Franco De Piero cut off the conversation in order to give some information to another interlocutor on another telephone line. In English he communicates the address of his Canadian firm based in Montreal, San Pierre 280, no. 455 to which the interlocutor can send him an envelope.

The examination of the data sheets of BGC show that from 1st January 2003 to 2nd April 2005 880 calls have been made to the phone numbers used by De Piero's firms. At the same time, from 2002 till 2004 De Piero acted as a supplier for the sole proprietorship Zorzi for an amount of € 1.282.815,77.

On 16th November 2004 Sices sales to BGC a car previously purchased by the Canadian firm JYC Auto Inc. through the intermediation of De Piero (resulting from an e-mail sent to JYC in which the former communicates to the latter the name of the German shipping agent who was looking after the requirements for the transport from Germany to Piacenza). In the period immediately preceding and immediately following the date 16th Nov. 2004 there have been 10 phone calls between BGC and De Piero. Furthermore the above mentioned e-mail, sent by De Piero to JYC, has been transmitted via fax by Cristalli to the shipping agent in Piacenza Sesap; this is another evidence for the relations between Cristalli and the North American car traders.

Despite the direct relations with De Piero, in this case BGC has interposed a fictitious firm headed by Zorzi; such interposition has no sense in a correct entrepreneurial management. The operation becomes clear when we consider that through this

interposition Cristalli pulls down the price of the cars obtaining cash repayments and undue VAT allowances.

7.  Zorzi's house in Salzburg has been searched and the agents found 33 cards (some in facsimiles) regarding fraudulent car trade. These cards (that according to Zorzi have been compiled by Cristalli) are of two types:

The cards relating to the car trade from 1999 till 2001 are divided into 12 columns and indicate the car model, the frame, the amount invoiced by Zorzi to Cristalli, the paid amount (PAGATO), always equivalent to the amount invoiced, the amount actually received by Zorzi for the sale of the car (CONCOR), the date and the names FRANCESCO (Zorzi) and GIANNI (Cristalli). The column "Gianni" always shows the amount resulting from the difference between the amount invoiced and the amount actually received by Zorzi (in substance the cash repayment from Zorzi to Cristalli);

the card relating to the car trade in in the course of the years 2002/2003 are divided into 16 columns and show (in addition to the same data shown in the other cards) the abbreviation F. and G. (Francesco Zorzi and Gianni Cristalli), the name of the final client of the car; the amount actually received by Zorzi (lower than the invoiced amount) is indicated with the abbreviation CONC E.

The two schedules represent a precise documentary proof for Zorzi's statements from various points of view:

I. Thanks to the car frame number the Italian Criminal Police was able to reconstruct the suitability between the data indicated in the schemes and what emerges from the invoices (cfr. exhibit no. 37, Criminal Police note lodged on 30th September 2005).

II. It is clear that the above mentioned schedules (at least those containing the name of the client) were compiled by Cristalli, because:

Zorzi couldn't know to whom Cristalli sold the cars;

all clients (about 60 persons) indicated in the tables have been interviewed and they confirmed they do not know Zorzi and purchased the cars from Cristalli.

III. If there had not been any cash return (as, on the contrary, stated by Zorzi) the data in the columns CONC E and CONCOR would not be explainable; the amounts in these columns are always lower than the invoiced amounts and they correspond to the amounts actually received by Zorzi. If there had not been any cash return, we could not explain the amounts shown in the column Gianni or G, resulting from the difference between the amount invoiced and the amount actually received; we could not understand the formulation that appears on a handwritten sheet found during the house search in Salzburg (cfr. exhibit 35 and police note dated 30th September 2005): "*repayments till today*" and beside the initials "Z" (for Zorzi) and "G" (for Gianni).

Let's examine a specific case to understand which advantage Cristalli obtains with such fraudulent operations:

The motor-car Mercedes ML 270, frame no. WDC163131X743858 was sold by F. Zorzi to BGC Corp. through the fictitious firm New Car di Marangoni with invoice no. 101 dated 15.2.01 for an amount of 94.000.000 Lit. inclusive of VAT. The same amount is indicated in thousands of Lire on the schedule, both in the column FATTURA (invoice) and in the column PAGATO (paid). In this case Cristalli's cash return – as indicated in the column "G" – was 9.000.000 Lit., resulting from the difference between the amount invoiced by Zorzi and paid by Cristalli (94.000.000) and the amount of 85.000.000 Lit. agreed on with Cristalli (column CONCOR = concordato = agreed on/arranged). The car

was on-sold by BGC Corp. Italia to Miceli Salvatore, with invoice no. 22 dated 2nd April 2001, made out for an amount of 97.000.000 Lit. inclusive of VAT.

Here the triple advantage for Cristalli:

First, he obtains proceeds not based on books amounting to 9 million Lit. exempt from any tax; second, he obtains further legitimate proceeds resulting from the difference between the purchase price (that appears in the invoice, even if not real) and the sales price, amounting to 3 million Lit.; third, Cristalli obtains an illicit VAT allowance of 15.666.667 Lit.

And all this happens for a sole automobile. Considering that the cars put on the market are so far 884, the profit (and the consequent damage for the exchequer) is enormous. Of course, it's now impossible to value the overall advantage for Cristalli, because the amounts of the cash returns were variable. This assessment is possible for 72 cars identified on the schedules seized in Salzburg and this is the outcome: proceeds not based on books resulting from the returns: € 412.221,40; legitimate profit: € 112.869,46; illicit VAT allowance: € 441.606,14.

8. Because of the importance of the schedules (see preceding point 7) a graphological advice has been ordered in order to establish if it was Cristalli who compiled the above mentioned schedules (as stated by Zorzi). The advisor has examined the letters and the figures on the documents and his definite conclusion is: "The signature affixed to the search warrants and the notes on the diaries, certainly belonging to Cristalli Giovanni, have been compared to the handwritten sheets seized, so it is possible to establish that they were written out by the same hand, i.e. by Cristalli Giovanni.

9. **During the interviews Zorzi stated that the fraudulent mechanism adopted with the US and Canadian suppliers was managed exclusively by Cristalli; Zorzi's statement in this matter found a documentary confirmation:**

**In the course of the importation activity the shipping agent has direct relations with the importer and certainly not with the purchaser of the latter. In the relations between Cristalli and Zorzi the situation is reversed because it is Cristalli that controls the importation, Zorzi is only the formal manager of the same. In fact:**

**I. The self-invoices made out by Zorzi for the extraction from the tax warehouse are sent to the shipping agent via fax by BGC.**

**II. The examination of the BGC data sheets show that BGC had 82 phone contacts in 2003 and 116 phone contacts in 2004 with the shipping company Parodi, who on the contrary should have had relations with Zorzi.**

**III. The same remark can be made on the shipping agent Sesap who managed the importations at the customs of Piacenza and with which BGC had 31 phone contacts in 2003, 24 in 2004 and 6 in 2005;**

**IV. The containers for the car transport from North America to Italy have been located by CP Ships. Once unloaded, the clearance order for the cars was sent to CP Ships from the fax of Cristalli and in this case too the circumstance is anomalous because the relations with the container leasing company should have been kept by Zorzi.**

**V. The bill of lading constitutes a document of transport (name of the sender and the receiver of the goods) as well as a document of title representative of the goods (to the extent that the holder of the title is the owner of the goods).**

It's strange to find bills of lading with Cristalli, bills sent to him by De Piero (since Cristalli should have nothing to do with the operation).
This anomaly is explainable in the light of Zorzi's statements; it also proofs the involvement of De Piero in the fraud, because he should send bills of lading to Zorzi and not to Cristalli.
VI. The above mentioned remarks show why it isn't so strange that the bills of lading are sent via fax from BGC to the shipping agent; it was Cristalli and certainly not Zorzi who administered all the operations.

10. During the search at Ettlingen in Dejzi Gruja's home (a friend of Zorzi) a computer was seized. The German authorities transmitted some data from the PC (used by Zorzi) and the result is very interesting: there is a file named balance xls. This file, compiled by Zorzi, contains a list of 193 cars indicating the mark, the model, the frame no., the colour, the cost, the sales price, the invoice number, the dates of invoice, delivery and payment, the buyer and the revenues. The column "cost" refers to the cost of the car inclusive of extra expenses and the column "sale" refers to the price agreed on with the buyer and actually collected. The column "profit" shows the difference between the cost and the sale, i.e. the profit of Zorzi.

According to the above mentioned information the Criminal Police was able to reconstruct the "return/repayment" of Cristalli (resulting from the difference between the sales invoice and the amount actually cashed by Zorzi for the sale and that appears in the column VENDITA (sale), the amount of the so-called gross proceeds shared out among Zorzi and Cristalli (resulting from the difference between the purchase invoice and the sales invoice) and the amount of the net gain of Zorzi. All this is completely summed up in the Criminal Police notation lodged on 6th October 2005 and in the relating exhibits containing the reconstruction of the automobile's data.

These schedules too represent a documentary substantiation of Zorzi's statement in the part in which he talks about the sharing of the VAT with Cristalli, because:
I. All the vehicles indicated in the schedule have been sold to Cristalli by Zorzi's fictitious firms, which purchased the cars from the communitarian firms Autohaus Laimer, Tecnicamer and CC Car Company.
II. The items VENDITA (indicating the amount actually cashed by Zorzi and lower than the amount invoiced) and RICAVO (representing the profit of Zorzi) have sense only if we see them from the "cash return" point of view.

11. The circumstance that Cristalli (and other car traders) used Zorzi's fictitious firms for his contingent tax necessities emerges from the examination of some car sales by the sole proprietorship Zorzi to BGC: from 4th to 9th Dec. 2003 Zorzi sales 8 cars to BGC; these cars are then written off with credit slips dated 26.5.2004. Before the write-offs, and in some cases before the sale to BGC, these cars had already been sold to other traders. Since Cristalli needed input taxes (December 2003), he simulated to purchase cars from Zorzi; once ceased this necessity, Cristalli obtains credit slips for cars already sold to the real purchasers.

The allegations against Cristalli have been completely confirmed by himself during the interrogation on 1st Dec. 2005.
As regards the relations with the North American suppliers, Cristalli stated:
Interview - 30 Nov. 2005

*As regards the cars that Zorzi purchased from the United States and from Canada I can report: In America there is a certain Franco De Piero who is a broker and who used to find the cars for BGC and probably for Motors Cristalli, too. I kept the relations with the American suppliers, to the extent that it was me who intervened in the negotiations, if necessary. The American suppliers made out invoices to Zorzi who sold-on the cars to me without paying VAT. I would like to point out that the amount of some invoices of the American suppliers is lower than the amount actually paid by Zorzi to the American suppliers; when Zorzi says that the percentage of my return on the car supplies from non EU countries was very high, he doesn't say that a part of the sum was paid to the American suppliers. You ask me how many cars have been over-invoiced, well at the moment I'm not able to answer this question.*

Interview – 5th December 2005

**Question**: *As regards the North American suppliers, who used to negotiate the price and to establish the entity of over-invoicing?*
**Answer**: *I negotiated the price with De Piero. You ask me to make an example of the percentages the Undersigned, Zorzi and the American supplier got as regards the sum that wasn't invoiced. For example: the American supplier makes out an invoice of 30.000,00 € (42.000 dollars). In reality the sum paid to the American supplier is 35.000 €, i.e. 30.000 + 3.000,00 € excise duty, 2.000,00 € recompense for Zorzi, 1.500,00 € for transport, 500,00 € for customs formalities and 1800,00 € for car registration for a total amount of 44.000,00 €. In reality, Zorzi invoices 50.000,00 € to me and I get back 6.000,00 € by cash. The slush money was shared in this way: 2000,00 € for Zorzi, 5000,00 € for the American supplier and 6000,00 € for me.*

The examination of the documents gathered during the investigation shows that the North American firms which had relations with Zorzi's fictitious firms and with Cristalli are the following:

a) Franco De Piero Classic Motors, 70 Carmelita St., San Francisco, CA 94117 – USA
b) Thomas & Shaughnessy, 1444 Camino Real, San Clements, CA 92672 – USA
c) Group One Motorcars LTD, 1221 Bowers 2215, Birmingham, Michigan, [248] 6462700 – USA
d) B.G.C. Corporation, 30 Old Rudnick Lane – Dover, Delaware 19901 – USA

We herewith ask for judicial assistance in order to:

A) issue a search warrant against the following firms:
   a) Franco De Piero Classic Motors, 70 Carmelita St., San Francisco, CA 94117 – USA
   b) Thomas & Shaughnessy, 1444 Camino Real, San Clements, CA 92672 – USA
   c) Group One Motorcars LTD, 1221 Bowers 2215, Birmingham, Michigan, [248] 6462700 – USA
   d) B.G.C. Corporation, 30 Old Rudnick Lane – Dover, Delaware 19901 – USA

   in order to seize all the records, bank documents, records not based on books, correspondence, orders, notes etc. regarding the relations between the above mentioned firms and the companies Motors Cristalli, BGC Corp., Zorzi



Francesco, Sices s.r.l., New Cars di Marangoni, impresa individuale (sole proprietorship) Marangoni and MG Car di Cortese Roberto;

B) take depositions - without assistance of a defence counsel and after a full identification – of the persons who had contacts with Giovanni Cristalli as regards the car sales relating to the above mentioned firms.

We underline that this judicial assistance request is **urgent** because some investigated persons are in custody.

If the requested assistance will be granted, we undertake to use the documents and the other information that may be requested only within the penal proceeding for which the judicial assistance has been requested, except in case of other authorizations, and we undertake not to use – without any explicit authorization – the content of the statements made during the rogatory procedure by any person against whom the requested Authority has wielded its power.

Art. 3 par. 2 of the Italy - US Mutual Legal Assistance in Criminal Matters Treaty:

the testimonies regard the relations with Giovanni Cristalli as regards the supply of the cars, the payments received by Zorzi Francesco, their amounts and the terms of payment. If the persons to be interviewed are identified as the legal representatives of the firms and assuming that the sums paid on the side were addressed to the latter, the same be informed of their right to refuse to ask the questions.

We finally ask you to permit our attending the rogatory proceeding and be notified of the date, time and place of execution of our letter of request.

The translation of the law sections is enclosed.

Sincerely    ˗ 3 APR. 2006

THE PUBLIC PROSECUTOR
(signed: *Dr. Paolo Storari*, subst.)

L'ESPERTO LINGUISTICO - C1
(Vincenzo Spezzano)

Art. 81 penal code – Formal conspiracy. Continued offence.

Everyone who with one action or omission violates different provisions of the law or commits several violations of the same provision of the law is punished with the sentence that should be given for the heaviest violation, raised up to three times as much.

Subject to the same punishment is who with several actions or omissions in execution of a criminal activity pattern scheme commits, also in different moments, several violations of the same or different provisions.

In the cases provided for by this article, the penalty cannot be higher than the penalty that would be applicable according to the preceding articles (671 C.Cr.P.).

Decree law 74/2000

*2) Fraudulent misrepresentation using invoices or other documents for inexistent operations.*

1. Everyone who, in order to evade the income tax or the value added tax making use of invoices or other documents for inexistent operations, indicates fictitious liabilities in one of the annual declarations of income relating to the mentioned taxes is punished with imprisonment from 1 year and 6 months to 6 years.
2. The fact is committed making use of invoices or other documents for inexistent operations when these invoices or documents are registered in the binding books or are possessed for evidence reasons toward the exchequer.
3. If the amount of the liabilities is lower than € 154.937,07 imprisonment from 6 months to 2 years is applied.

*8) Issuing invoices or other documents for inexistent operations*

1. Everyone who, in order to allow a third person to evade income tax or value added tax, makes out invoices or other documents for inexistent operations, is punished with imprisonment from 1 year and 6 months to 6 years.
2. In order to apply the provision provided for in art. 1, the issuing of several invoices or documents for inexistent operations during the same taxable period is considered as a single offence.
3. If the false amount quoted in the invoices or in the other documents is lower than € 154.937,07 per taxable period, imprisonment from 6 months to 2 years is applied.

216 (Fraudulent bankruptcy)
An entrepreneur declared bankrupt is punished with imprisonment from three years to 10 years if:

1) he has misappropriated, concealed, destroyed or dissipated, completely or in part, his goods or, in order to impair creditors, exposed or recognized inexistent liabilities;

2) he has taken away, destroyed or falsified, completely or in part, books and other account documents or kept them so that it is impossible to reconstruct the property or the business movement in order to obtain an unjust profit for him or others or to impair creditors.

The same punishment is applied to the bankrupt entrepreneur who during the bankruptcy procedure commits an offence provided for in point no. 1) of the preceding paragraph, i.e. takes away, destroys or falsifies the books or the other account documents.

The bankrupt who before or after the bankrupt procedure effects payments or simulates preemptive rights in order to favour some creditors to the prejudice of other creditors is punished with imprisonment from 1 to 5 years.

Additional penalties excepted (see chapter III, title II, book I of the penal code), the conviction for one of the actions provided for in this article implies the legal disqualification from running a trading firm and the incapacity of exercising an executive function in any company for ten years.

219 (Aggravating circumstances and extenuating circumstances)
If the actions provided for in art. 216, 217 and 218 have caused a relevant damage to property, the penalties can be raised.
The penalties established by the above mentioned articles are raised
1) if the responsible has committed several actions among those provided for in any of the indicated articles;
2) if the responsible couldn't run a trading firm by law.
If the actions provided for in the first paragraph have caused a particularly tenuous property damage, the penalty is reduced to a third.

223 (Facts of fraudulent bankruptcy)
The penalties provided for in the art. 216 is applied to directors, executives, auditors and trustees in bankruptcies, who have committed one or more of the facts provided for in the above mentioned article.
The penalty provided for in the 1st par. of the art. 216 is applied to the above mentioned persons if:
1) they have caused or participated in causing the setback of the company committing one or more of the facts provided for in art. 2621, 2622, 2626, 2627, 2628, 2629, 2632 and 2634 of the civil code;
2) they have caused the bankruptcy of the company acting deceitfully or through fraudulent operations.
The disposition provided for in the last paragraph of art. 216 is applied in any way.

**D.P.R. 26th Oct. 1972 no. 633 – Introduction and regulation of the added value tax**
Art. 70 – Application of the tax

1. The tax on the importations is established, liquidated and collected for each operation. For disputes and sanctions, the dispositions of the customs laws regarding the border rights are applied.
2. For importations made without any payment of tax (see letter c. - art. 8), the importer who untruly declares to have the right to receive the treatment provided for therein or excessively benefits from it, is punished with the financial penalty provided for in the third paragraph of art. 46, except the fact constitutes an offence according to the customs law.
3. The tax for the introduction of goods into the Nation by mail service has to be discharged according to the formalities provided for in a proper Decree of the Ministry of Finance in concert with the Post and Telecommunications Ministry.
4. The tax discharged for the importation of goods made by bodies, associations and other organizations described in the art. 4, par. 4, can be reimbursed on application according to the formalities provided for in a proper Decree of the Ministry of Finance, if the goods are shipped to an other EU-State. The reimbursement is effected on the condition that a proof is supplied that the goods have been subjected to the income tax within the destination member State.
5. For the importation of gold and semi-finished goods with a purity equivalent to or higher than 325 millesimal, effected by taxable persons within the territory of the tax receiving State, ascertained and liquidated in the customs declaration under an attestation made therein, is discharged according to the dispositions provided for in title II; to that end the customs document has to be noted down - with respect to the month of release of the same document – in the registers provided for in art. 23 or 24 and – for deduction purposes – in the register provided for in art. 25.
6. The dispositions provided for in the preceding paragraph are applied to the importations of goods indicated in par. 7 and 8 of art. 74 regarding the dispositions on particular sectors.

---

**D.P.R. 23rd Jan. 1973, no. 43 – Approval of the Consolidation act of the legislative dispositions in the matter of customs.**
Art. 292 – Other cases of smuggling

Every one who – except for the cases provided for in the preceding articles – abstracts goods from the payment of the border rights due, is punished with a financial penalty not less than two and not exceeding ten times the same rights.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

IN RE LETTER OF REQUEST        )
FROM ITALY                     )
IN THE MATTER OF               )    Misc No. 06-
CRISTALLI                      )

<u>ORDER</u>

Upon application of the United States of America; and upon examination of a letter of request from Italy whose authorities are seeking certain testimony and information from individuals which may be found in this District, for use in a judicial proceeding in Italy and the Court being fully informed in the premises, it is hereby

**ORDERED,** pursuant to Title 28, United States Code, Section 1782, that Richard G. Andrews, Assistant United States Attorney, hereby is appointed as Commissioner of this Court and is hereby directed to execute the letter of request from the Italian authorities as follows:

1. to take such steps as are necessary, including issuance of commissioner's subpoenas to be served on persons within the jurisdiction of this Court, to collect the evidence requested;

2. provide notice with respect to the collection of evidence to those persons identified in the requests as parties to whom notice should be given (and no notice to any other party shall be required);

3. adopt procedures to collect the evidence requested

consistent with its use as evidence in a proceeding before a Court in Italy, which procedures may be specified in the request or provided by the Italian authorities;

4. seek such further orders of this Court as may be necessary to execute this request; and

5. certify and submit the evidence collected to the Office of International Affairs, Criminal Division, United States Department of Justice, or as otherwise directed by that office for transmission to the Italian authorities.

IT IS FURTHER ORDERED that, in collecting the evidence requested, the Commissioner may be accompanied by persons whose presence or participation is authorized by the Commissioner.

Dated:   This _____ day of _____, 2006.

_____
United States District Court Judge